UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARIIX, LLC,<br><br>                    Plaintiff,<br><br>v.<br><br>NUTRISEARCH CORPORATION, et al.,<br><br>                    Defendant. | Case No.:  17CV320-LAB (DDL)<br><br>**ORDER RE: REMAND** |

Plaintiff Ariix, LLC ("Ariix"), a nutritional supplement company, brings this suit under the Lanham Act based on a theory of false advertising. Ariix alleges that Defendants NutriSearch Corporation ("NutriSearch"), the publisher of the *NutriSearch Comparative Guide to Nutritional Supplements* ("*Guide*"), and Lyle MacWilliam, the *Guide's* author (together with NutriSearch, "Defendants"), were directly funded by Ariix's competitor, USANA Health Sciences, Inc. ("Usana"), so that Usana could achieve the *Guide's* number-one rating for nutritional supplements. This Court originally dismissed Ariix's false advertising claim, but in a two-one decision, the Ninth Circuit reversed, finding that Ariix had "plausibly alleged that the defendant's publication was commercial speech, was sufficiently disseminated, and contained actionable statements of fact." (Dkt. 41 at 2). The appellate panel remanded the case to this Court to decide the third element of a

Lanham Act claim—whether the defendant's publication was for the purpose of influencing consumers to buy the defendant's goods or services. Having considered the parties' briefings on this issue, the Court finds as follows.

## I.  BACKGROUND

On February 16, 2017, Ariix commenced this suit against Defendants,[1] bringing a false advertising or promotion claim under the Lanham Act, 15 U.S.C. § 1125(g). (Dkt. 1). Following its initial dismissal of Ariix's original Complaint, the Court again dismissed Ariix's First Amended Complaint ("FAC"), finding that Ariix failed to plead facts showing that a consumer review publication like the *Guide* meets the definition of "commercial advertising or promotion" under the Lanham Act. (Dkt. 27). Specifically, the Court held that consumer product reviews fall outside the scope of § 1125(a)(1)(B) because they are not commercial speech and instead are statements of opinion. The Court also found that Ariix had failed to plausibly allege that Defendants had made false statements about Usana's or Ariix's products.

On Ariix's appeal, the Ninth Circuit narrowly considered whether Ariix had plausibly alleged that NutriSearch had engaged in "commercial speech" in its publication of the *Guide*. (Dkt. 41); *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021). In distinguishing commercial and non-commercial speech, the Ninth Circuit looked to the three *Bolger* factors: whether (1) "the speech is an advertisement," (2) it "refers to a particular product," and (3) "the speaker has economic motivation." *Id.* at 1115–16 (quoting *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011)); *see also Bolger v. Youngs Drug Prods. Corp.*, 463

---

[1] Ariix initially filed this suit against NutriSearch, MacWilliam, and Usana, but on March 21, 2022, the Court dismissed Usana from this action for lack of personal jurisdiction. (Dkt. 67). On April 1, 2022, Ariix notified the Court of its intent not to seek leave to amend its claim against Usana. (Dkt. 69).

U.S. 60, 66–67 (1983). The court's analysis turned primarily on the third factor, which "asks whether the speaker acted *primarily* out of economic motivation, not simply whether the speaker had *any* economic motivation." *Id*. at 1116 (emphasis in original). The panel majority found that the *Guide* "is more like a sophisticated marketing sham rather than a product review guide," thereby rendering it "paid promotion" free from the protections enjoyed under the First Amendment. *Id*. at 1118–19 ("Simply put, paid promotion is commercial speech."). The panel majority concluded that where, as here, it's alleged that a publisher claiming to offer independent product reviews has secretly rigged the ratings to favor one company over another in exchange for financial compensation, such speech can be considered commercial. The majority also ruled that Defendants were not shielded by the First Amendment and that Ariix had "plausibly alleged that the defendant's publication was commercial speech, was sufficiently disseminated, and contained actionable statements of fact." (*Id*. at 2).

The panel majority left it to this Court to decide, on remand, whether Defendants' publication was made "for the purpose of influencing consumers to buy defendant's goods or services." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999). The Court now looks to Ariix's Second Amended Complaint ("SAC") and considers this issue in the first instance.[2]

---

[2] Ariix filed a Notice of Supplemental Authority of a related case filed by Ariix against Usana in the District of Utah for allegations mirroring those in the present case. (*See* Dkt. 72); *Ariix LLC v. Usana Health Scis., Inc.*, No. 2:22-cv-00313-JNP-DAO (D. Utah). Specifically, Ariix brings to the Court's attention that court's Decision and Order Denying Defendant's Motion to Dismiss, including Judge Jill Parrish's interpretation of the Ninth Circuit's Mandate regarding whether Ariix had plausibly alleged the existence of an agency relationship between Usana, NutriSearch, and MacWilliam. Although the Court is not bound by the Utah court's reasoning, pursuant to Federal Rule of Evidence 201, the Court nevertheless takes judicial notice on its own of the Utah court's decision. *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir.

## II. ANALYSIS

To establish a false advertising claim under the Lanham Act, a plaintiff must allege "a false or misleading representation of fact in commercial advertising or promotion that misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." *Prager Univ. v. Google LLC*, 951 F.3d 991, 999 (9th Cir. 2020) (internal citations and quotation marks omitted). The Ninth Circuit defines "commercial advertising or promotion" as "(1) commercial speech, (2) by a defendant who is in commercial competition with plaintiff, (3) for the purpose of influencing consumers to buy defendant's goods or services, and (4) that is sufficiently disseminated to the relevant purchasing public." *Ariix*, 985 F.3d at 1115; *see also Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1054 (9th Cir. 2008).

This Court must decide whether there is evidence to support a plausible claim as to the third element of a false advertising claim—that is, whether Ariix has plausibly alleged that publication of the *Guide* was intended to influence consumers to buy NutriSearch's product. While the Ninth Circuit didn't decide this issue on appeal, the panel majority did note that the allegations in the complaint suggest that the advertising was "intended to help *Usana's* goods, not NutriSearch's product," *Ariix*, 985 F.3d at 1120, and that in analyzing this element, it may be helpful for this Court "to determine whether the defendants and Usana had an agency relationship; for example, it might be the case that the defendants were acting as agents of Usana and therefore had a vested interest in the goods that Usana sold, which might be enough to satisfy this element," *id*. at 1120 n.10. Judge Collins likewise noted in his dissent that the third element may be satisfied

---

1992) (holding that a court may take judicial notice of "proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue") (citation omitted).

with allegations suggesting that "Defendants . . . acted on Usana's behalf or at its direction by secretly making, in exchange for compensation, specific changes requested by Usana in its own or competitors' product reviews in the *Guide*." *Id*. at 1126. He concluded, however, that the complaint falls short of alleging a true agency relationship between Defendants and Usana:

> That Defendants wrote obsequious reviews in the hope that Usana would be pleased and buy more *Guides* or give MacWilliam speaking engagements does not make them Usana's agents in writing those reviews. Nor does it establish that they acted on Usana's behalf or subject to its control in doing so.

*Id*. at 1127. Instead, he opined that "the complaint's factual allegations establish, at most, that Defendants produced biased reviews in the craven hope that Usana would then act in ways that were economically favorable to Defendants." *Id*. at 1126.

Ariix takes umbrage with the dissent's conclusion, arguing that, "[w]hether assessed as a hidden financial arrangement, an agency relationship, or a conspiracy, MacWilliam and NutriSearch had a vested interest in the sale of Usana's goods sufficient to attribute Usana's goods to them." (Dkt. 45 at 6). The Court agrees.

### A. Ariix's Allegations

Ariix alleges in its complaint that Defendants are closely associated with Usana and that "Usana pays NutriSearch and MacWilliam hundreds of thousands of dollars per year and provides substantial other benefits—such as book sales to Usana representatives—which altogether account for more than 90% of MacWilliam's income." (Dkt. 44, SAC at 1–2). In return, Ariix claims, "Usana exercises ultimate control over MacWilliam and NutriSearch's product," namely by having Defendants "manipulate their ratings criteria to ensure Usana remains the top-rated supplement company in the guide and actively sandbag Usana's

competitors' ratings and certifications." (*Id*. at 2). According to Ariix, all this is done in an effort to "ratchet up sales for Usana products." (*Id*. at 1–2).

      More specifically, Ariix alleges that MacWilliam was a former Usana sales representative and on Usana's advisory board member until 2005, when MacWilliam decided he should resign because he believed his affiliation with Usana gave the appearance of bias. (*Id*. ¶ 23). He approached Usana executives, explaining that he'd like to continue publishing the *Guide* in exchange for Usana's financial support: "I am going to create more of a third-party appearance, but I'd like you to use me for speaking and support me." (*Id*.). Usana allegedly agreed, but only if MacWilliam promised to "give [Usana] the number-one rating." (*Id*.). Ariix alleges that MacWilliam accepted, "assuring Usana it would get the number-one rating despite the guide's claims of independence and objectivity." (*Id*.). Ariix further alleges that Defendants are "entirely dependent" on compensation from Usana. (*Id*. ¶ 26). For instance, "Usana directly pays [Defendants] hundreds of thousands of dollars per year in fixed stipends, speaking fees, promotion fees, and travel fees"; Usana "heavily promotes the guide to its sales representatives and encourages them to purchase it"; Defendants "almost always tie[] the publication of a new edition of the guide to the date of Usana's annual convention" so as to "continue to direct associates to the latest edition" and ensure "robust sales" of the *Guide*; and at Usana's speaking events, "MacWilliam is the only purportedly 'independent' speaker who is allowed to promote and sell his own products at such events." (*Id*. ¶¶ 26–27). Ariix contends that there is a direct correlation between awarding Usana the top rating in the *Guide* and an increase in Defendants' book sales: "not only do[] [Defendants] rate Usana highest because of the incentive to increase Usana's sales and to keep Usana happy, but also because, driven by the dictates of Usana, Usana's distributors are their largest market segment [for sales of the *Guide*]." (*Id*. ¶ 29).

      As evidence of this alleged illicit agreement between Defendants and Usana,

Ariix claims that during times when Defendants "have failed to meet their commitments to Usana"—i.e., awarding the top Gold Medal certification to another company—"Usana punished [Defendants] for failing to deliver per their agreement by cutting them off financially." (*Id*. ¶ 31). Ariix points to one such instance in 2008, when an Usana executive explained to MacWilliam that "we don't want to stand up and say 'we're one of the five best'"—Usana wants to be "number one." (*Id*.). MacWilliam allegedly asked in response whether it would "help if Usana is number one in some way," to which the Usana executive responded, "of course it would help." (*Id*.). NutriSearch allegedly "cured this breach of its secret agreement with Usana by coming out with a new award called 'Editor's Choice' and giving it to Usana." (*Id*. ¶ 32). NutriSearch allegedly did so "with the explicit understanding that the new award—which allowed Usana to again be 'the best'—would entitle MacWilliam to return to the Usana event circuit to speak and sell more books, and thus earn more speaking fees and book royalties." (*Id*.).

In the same vein, the following year when "another company was actually going to beat Usana," MacWilliam explained the situation to Usana, to which an Usana executive responded that "we pay [Defendants] to make us number one." (*Id*. ¶ 35). MacWilliam then advised Usana that it would either need to change something in its formula or Defendants would need to change their matrix. (*Id*.). MacWilliam "worked with Usana to adjust his allegedly objective matrix so that Usana stayed on top." (*Id*. ¶ 35). Ariix alleges that, each year thereafter, "Usana *required* MacWilliam to adjust his matrix" to ensure Usana remained the top-rated company in the *Guide*. (*Id*. ¶ 36 (emphasis in original)). Ariix argues that the *Guide* is thus "not only a tool for Usana's promotion, but also for the sabotage of its competitors," like Ariix. (*Id*. ¶ 42).

### B. Financial Arrangement

Ariix specifically contends that "NutriSearch and MacWilliam can be liable for their statements intended to influence consumers to buy Usana's products"

because "they had an explicit agreement with Usana to act as its clandestine agents, juicing its sales under a financial agreement hidden from consumers, to whom they hold themselves out as independent, objective nutrition supplement reviewers." (Dkt. 45 at 8). On appeal, the panel confirmed this view, finding that Ariix had "plausibly alleged that NutriSearch and MacWilliam published the Guide mainly with the economic goal of furthering their own self-interests beyond simply benefiting from sales of the publication." *Ariix*, 985 F.3d at 1117. They held that Ariix had sufficiently alleged that Defendants "published the Guide mainly to reap the financial benefits of a hidden marketing arrangement with Usana rather than to inform consumers about nutritional supplements." *Id*.

Indeed, the SAC plausibly alleges the existence of a hidden financial agreement between Defendants and Usana. According to allegations in the SAC, MacWilliam was paid "hundreds of thousands of dollars" under the guise of speaking fees in exchange for awarding Usana's products the *Guide's* number-one rating. (SAC ¶¶ 26–27). The SAC states that, on occasions when Defendants failed to name Usana as the Gold Medal recipient, Usana withdrew its financial support from Defendants, who were then faced with declining book sales. (*Id*. ¶ 31). In response, Defendants created a new award, called the "Editor's Choice" award, and gave it to Usana "with the explicit understanding that the new award . . . would entitle MacWilliam to return to the Usana event circuit to speak and sell more books, and thus earn more speaking fees and book royalties." (*Id*. ¶ 32). To be sure, such an alleged arrangement was never made apparent to consumers—the *Guide* was explicitly touted as an independent publication, and Defendants never disclosed that Usana's number-one rating was the result of the parties' secret dealings or that the *Guide* was influenced by a third-party.

While it may be true that the parties' "hidden financial agreement" helped increase the sale of *Usana's* products, the SAC does also allege that NutriSearch and MacWilliam were financially incentivized to promote those products to

8

17CV320-LAB (DDL)

consumers. As the SAC explains, sales of the *Guide* to Usana's distributors account for the vast majority of the *Guide*'s sales, meaning that refusing to award Usana the number-one rating and thereby failing to promote Usana's products removes Defendants' access to its largest market segment and its main source of income. (*Id.* ¶ 29). Awarding Usana the top rating afforded Defendants the opportunity to not only sell more of the *Guide* due to increased distribution access, but also earn "hundreds of thousands of dollars per year in fixed stipends, speaking fees, promotion fees, and travel costs." (*Id.* ¶ 26). The parties here had a clear financial arrangement designed to influence consumers to buy products from a third-party in which Defendants had a direct financial stake. *See also Grasshopper House, LLC v. Clean & Sober Media, LLC*, No. 2:18-cv-00923-SVW-RAO, 2018 WL 6118440, at *7 (C.D. Cal. July 18, 2018) (citing *Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 294 (S.D.N.Y. 2016) (holding that "by alleging that [Defendant] earns a commission on directed sales of [products sold by Plaintiff's competitor], the SAC adequately pleads that [Defendant] had an economic incentive to engage in such promotion," and that such commercial speech was "made for the purpose of influencing consumers to buy products in which [Defendant] has a financial stake") (internal citations and brackets omitted)).

### C. Agency Relationship

In light of the financial arrangement between Defendants and Usana, the Court is persuaded that an agency relationship existed between them, and that Defendants' alleged misrepresentations were made within the scope of this principal-agent relationship.

#### 1. Defendants Acted as Usana's Agent

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent

manifests assent or otherwise consents so to act." *Mavrix Photographs, LLC v. LiveJournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017) (as amended) (quoting Restatement (Third) of Agency ("Restatement") § 1.01 (Am. Law Inst. 2006)). "For an agency relationship to exist, an agent must have authority to act on behalf of the principal and '[t]he person represented [must have] a right to control the actions of the agent.'" *Id.* (quoting Restatement § 1.01 cmt. c). Actual control is not necessary; as long as there is an agreement that the principal has the right to control the agent, an agency relationship exists. *United States v. Bonds,* 608 F.3d 495, 506–07 (9th Cir. 2010) ("[W]e do not maintain there needs to be an explicit agreement, but there must be at least some manifestation of assent to the principal's right to control.").

First, the Court is persuaded that Ariix has plausibly alleged facts that support the inference that Usana manifested assent to Defendants acting on its behalf. The SAC discusses an agreement made between Defendants and Usana that Defendants would be awarded the number-one rating in the *Guide* "in exchange [for] financial support from Usana," including speaking fees and access to Usana's distributors in order to sell more copies of the *Guide*. (SAC ¶ 23). The SAC states:

> This agreement firmly established that, though cloaked in secrecy so that the guide would continue to appear independent, MacWilliam and NurtriSearch's agreement with Usana was one in which Usana exercised control over their editorial discussions, and MacWilliam and NutriSearch's renumeration was tied to and dependent on selling more Usana products, principally by elevating Usana above all its competitors in the guide (and keeping it that way).

(*Id* ¶ 24). Specifically, the SAC discusses an exchange between Defendants and Usana dating back to 2005 where MacWilliam approached Usana and asked it to "use [him] for speaking and support [him]," and Usana agreed on the condition that

MacWilliam "give [Usana] the number-one rating." (*Id*. ¶ 23). In a later year, perhaps around 2008, when Ariix realized another company would beat Usana according to Ariix's rating criteria at the time, MacWilliam approached Usana about the situation and proposed changing the ratings "matrix" to ensure that Usana would remain number one. (*Id*. ¶ 35). Usana "agreed, and MacWilliam worked with Usana to adjust his allegedly objective matrix so that Usana stayed on top." (*Id*.). Defendants argue in response that Ariix's allegations are merely conclusory and that more detail is needed regarding the alleged agreement. (Dkt. 50 at 11). But the precise details of the agreement are not required at this stage in the litigation, and the Court finds that the SAC sufficiently establishes the existence of an agreement created through Usana's assent.

Next, the Court finds that the SAC plausibly alleges that Defendants consented to act on Usana's behalf and agreed to be subject to its control. As previously discussed, Ariix alleges that MacWilliam was the one to approach Usana and propose that he favor Usana in his ratings in exchange for speaking opportunities and financial support. (SAC ¶ 23). The complaint details the lengths Defendants would go to ensure they retained this financial support, including "arbitrarily revising their so-called objective scientific criteria or by tweaking the advisable amounts of particular ingredients of a supplement formula in order to weight the criteria in Usana's favor." (*Id*. ¶ 36) ("Usana **required** MacWilliam to adjust his matrix in coordination with Usana so that Usana's new formulation would come out on top . . . And every year, [MacWilliam] did so.") (emphasis in original). Ariix also alleges that on occasions when Defendants failed to meet their commitments to Usana, Usana would punish Defendants by cutting them off financially, and that Defendants capitulated by creating the "Editor's Choice" award and giving it to Usana in exchange for being allowed to return to "the Usana event circuit to speak and sell more books, and thus earn more speaking fees and book royalties." (*Id*. ¶ 31). The relationship described in the complaint plainly suggests

one in which Defendants voluntarily yielded to Usana's desires and complied with its directives in order to secure Usana's financial backing.

The existence of an agency relationship also depends on the level of control a principal exerts over the agent. *See Bonds*, 608 F.3d at 505 (quoting *NLRB v. Friendly Cab Co.*, 512 F.3d 1090, 1096 (9th Cir. 2008)). The Court need not find that the principal "*actually* control[s] [the] agent as a prerequisite for establishing a[n] [agency] relationship, rather the principal need only have 'a *right* to control the actions of the agent.'" *McAdory v. M.N.S. & Assocs., LLC*, No. 3:17-CV-00777-HZ, 2021 WL 2321634, at *7 (D. Or. June 7, 2021) (emphasis added) (citing Restatement § 1.01 cmt. c). The Court is persuaded here that the SAC supports an inference that Usana exerted control over Defendants. The complaint suggests that "Usana exercised control over [Defendants'] editorial decisions," (SAC ¶ 24), and that Usana was clear in its directive that it be awarded the number-one award or else it would withdraw its financial support. Defendants now attempt to parse the complaint's allegations and frame Usana's actions as the exercise of mere "influence" rather than as "control." (Dkt. 50 at 12 ("To be sure, Ariix's allegations plausibly suggest that Usana might have sometimes attempted to influence MacWilliam's behavior and exerted that influence by declining to promote MacWilliam and the Guide when its reviews were less than superlative. . . . [But] under bedrock principles of agency law, that's just not enough.")). Semantics aside, though, the nature of the allegations remains this: Usana exercised its right to control Defendants by conditioning its financial support on the guarantee that it would remain the top-rated supplement company in the *Guide*. That Usana went so far as to require that Defendants change their entire ratings matrix to ensure Usana received the number-one award is highly suggestive of Usana's right to control not only Defendants' end product, but also the manner and methodology of Defendants' performance. *See Mavrix Photographs*, 873 F.3d at 1055.

The SAC plausibly alleges that Usana manifested assent, Defendants

consented to act as Usana's agent, and Usana exercised control over Defendants. Ariix has thus pled facts to support the inference that Defendants had an agency relationship with Usana.

### 2. Scope of Defendants' Authority

Relying on the Restatement, the Ninth Circuit recognizes four avenues through which an agency relationship may be established: "actual authority, apparent authority, ratification, and employment (respondeat superior)." *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 449 (9th Cir. 2018). Here, Ariix argues that agency was created through actual authority given to Defendants to act on Usana's behalf, Usana's exercise of substantial control over Defendants, and Usana's ratification of Defendants' actions. (Dkt. 45 at 9–15).

An agent has actual authority to take a certain action when "the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement § 2.01. Actual authority is limited to actions "specifically mentioned to be done in a written or oral communication" or "consistent with" a principal's "general statement of what the agent is supposed to do." *Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 940 (9th Cir. 2017) (quoting *N.L.R.B. v. Dist. Council of Iron Workers of the State of Cal. & Vicinity*, 124 F.3d 1094, 1098 (9th Cir. 1997)). Ratification, on the other hand, occurs when the principal accepts the benefit of the agent's act either with actual knowledge of the material facts or with "knowledge of facts that would have led a reasonable person to investigate further"—also known as "willful ignorance." *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073–75 (9th Cir. 2019).

Ariix's allegations regarding the nature of the relationship between Defendants and Usana are consistent with the elements of an agency relationship created through actual authority. Usana communicated a clear directive that Defendants do what it takes to ensure Usana received the top award in the *Guide*.

Usana threatened to withdraw financial support and deny Defendants access to Usana's distribution market if they didn't comply with this directive. As alleged in the SAC, Usana was direct in its instructions to Defendants, and was aware of Defendants' efforts to falsely market the *Guide* as an objective and independent publication. MacWilliam even worked hand-in-hand with Usana to reformulate the so-called objective rating criteria to ensure Defendants could follow through on their agreement to keep Usana as the top-rated company. And while the precise details of their agreement remain unknown, including whether Usana's instructions were written or communicated verbally to Defendants, such facts are appropriate for discovery at a later stage in this litigation. At this pleading stage, the Court is persuaded that Defendants acted with actual authority and pursuant to an actual agreement with Usana to falsely advertise the *Guide* as an objective, independent publication on which consumers believed they could safely rely.

### III. Conspiracy

Finally, Ariix suggests that Usana's goods may be attributable to Defendants because "they consciously committed to an unlawful scheme that goes directly to the heart" of the third Lanham Act element. (Dkt. at 17). Ariix argues that a "sham marketing scheme," such as the one alleged in this case, amounts to a civil conspiracy, which occurs "when the parties have reached 'a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.'" (*Id.* (quoting *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1020 (9th Cir. 1985)). Ariix maintains that "Usana's goods can be imputed to NutriSearch and MacWilliam as co-conspirators" and knowing participants in the scheme. (*Id.* at 18).

However, having already established that Defendants were acting as Usana's agents pursuant to actual authority from Usana, the Court concludes that the SAC plausibly alleges that Defendants acted with the purpose of influencing consumers to buy their goods or services. The Court therefore need not reach the

issue of whether Ariix has pled enough facts to suggest the existence of a conspiracy.

## IV.   CONCLUSION

The allegations in the complaint satisfy the third element of a Lanham Act claim. A scheduling order will follow.

**IT IS SO ORDERED**.

Dated:  April 13, 2023

                                            _____
                                            Hon. Larry Alan Burns
                                            United States District Judge